T.C. Memo. 2005-113

UNITED STATES TAX COURT

ALLEN AND MARY DOXTATOR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1508-03.                    Filed May 18, 2005.

Allen and Mary Doxtator, pro se.

<u>Mark J. Miller</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined deficiencies in income taxes and penalties under section 6662(a)[1] with respect to petitioners' 1997, 1999, and 2000 taxable years as follows:

---

[1] Unless otherwise noted, section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

|       |            | Penalty      |
| Year  | Deficiency | Sec. 6662(a) |
|-------|------------|--------------|
| 1997  | $7,702     | $363.00      |
| 1999  | 6,671      | 43.60        |
| 2000  | 4,926      | 58.40        |

Following concessions,[2] the issues remaining for decision are: (1) Whether $23,480, $22,450, and $13,550 received by petitioner Mary Doxtator (Mrs. Doxtator) in 1997, 1999, and 2000, respectively, from the Oneida Tribe of Indians of Wisconsin (Oneida Tribe or Tribe) for services as a judicial officer are subject to income tax and self-employment tax; (2) whether petitioner Allen Doxtator (Mr. Doxtator) was engaged in a trade or business in 1997 and 2000, entitling petitioners to cost of goods sold of $225 in 1997 and trade or business deductions of $7,580 and $7,748 for 1997 and 2000, respectively; (3) whether petitioners received short-term capital gain of $1,000 and long-term capital gain of $146 in 1999; (4) whether petitioners received taxable dividends of $281 in 1999; (5) whether $3,000 petitioners received from the Oneida Tribe in 1999 is taxable; (6) whether petitioners are entitled to charitable contribution deductions of $5,899 and $3,969 in 1997 and 2000, respectively; (7) whether petitioners are entitled to a casualty loss in 2000

---

[2] Respondent conceded $1,090 of the $4,516 casualty loss petitioners claimed in 2000.  Petitioners conceded taxable interest income of $64 and $121 for 1999 and 2000, respectively, at trial.

of $4,516, or $1,090 as conceded by respondent; (8) whether petitioners are liable for an accuracy-related penalty under section 6662(a) based on a substantial understatement of income tax or on negligence for 1997 and 1999; and (9) whether petitioners are liable for the accuracy-related penalty under section 6662(a) based on negligence for 2000.  In addition, petitioners challenge our jurisdiction to decide certain of the foregoing issues, as more fully discussed infra.

FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated by this reference.[3]

Petitioners resided in Wisconsin at the time they filed the petition in this case.  Petitioners are husband and wife and filed joint Federal income tax returns for 1997, 1999, and 2000. Petitioners are Native Americans and members of the Oneida Tribe.

Compensation for Services as Judicial Officer

In 1997, 1999, and 2000, Mrs. Doxtator worked for the Oneida Tribe as a "judicial officer" of the Oneida Appeals Commission and the Oneida Personnel Commission.  The business of the Oneida Tribe is run by a business committee.  Mrs. Doxtator was appointed to the position of judicial officer for a 3-year term

---

[3] A portion of the transcript of the trial proceedings in this case was lost because of errors of the reporting service. As a consequence, the parties entered into a supplemental stipulation of facts as an agreed substitute in lieu of any other remedy.

by the business committee of the Oneida Tribe. In her capacity as a judicial officer, she heard disputes between the Oneida Tribe and its employees. The hearings were conducted at various locations to which Mrs. Doxtator traveled at her own expense. Her decisions were binding on the Tribe and its employees. She controlled her own schedule and heard as many or as few cases as she chose. She received a $125 stipend per case heard, regardless of its duration.

Mrs. Doxtator received $23,480, $22,450, and $13,550 in 1997, 1999, and 2000, respectively, as compensation for her services as a judicial officer from the Oneida Tribe. The Oneida Tribe issued Forms 1099-MISC, Miscellaneous Income, reporting these payments to Mrs. Doxtator in each year. Petitioners did not report on their 1997, 1999, or 2000 return, nor pay self-employment taxes with respect to, the foregoing amounts received by Mrs. Doxtator. Respondent determined that the foregoing amounts were subject to income and self-employment tax.

Native American Finance

Petitioners attached to their 1997 and 2000 returns a Schedule C, Profit or Loss from Business, for an undertaking called "Native American Finance". According to Mr. Doxtator, the Native American Finance business consisted of Mr. Doxtator's activities in contacting Native American tribes to advise tribal leaders of a revenue ruling that he believed eliminated liability

for employment taxes for elected tribal officials. In return for this information, Mr. Doxtator sought a "finder's fee" equal to 6 percent of the taxes recovered pursuant to the ruling. He contacted tribes seeking meetings to present his advice and requested that the tribes provide him with meals and lodging in connection with his travel to the meetings. Mr. Doxtator traveled as far as 500 miles for such meetings and made repeat visits in some instances.

During the years at issue, Mr. Doxtator never received payment of any finder's fees. He considered there to be oral agreements regarding his fees with the tribes with whom he met. After failing to receive payment, he did not seek written contracts; instead, he sought to recover the fees by requesting payment from newly elected members of the tribal leadership.

On the 1997 Schedule C for Native American Finance, petitioners reported gross receipts of $613, cost of goods sold of $225, and expenses of $7,580. On the 2000 Schedule C for Native American Finance, petitioners reported gross receipts of $465 and expenses of $7,748. The amount reported as gross receipts comprised reimbursements of travel expenses to Mr. Doxtator by the tribes he visited. Some of the expenses claimed on the 1997 and 2000 Schedules C were Mrs. Doxtator's travel expenses incurred in connection with her duties as a judicial officer.

Respondent determined that Native American Finance was not a trade or business and disallowed the claimed cost of goods sold in 1997 and the deductions for the claimed expenses for 1997 and 2000. The determination shifted the 1997 and 2000 reported gross receipts from Schedule C to line 21, "Other Income", of the Form 1040, U.S. Individual Income Tax Return.

Capital Gains

On January 20, 1999, Mrs. Doxtator purchased 600 shares of American Pad & Paper Co. for a total cost of $650.50 which she sold on April 21, 1999, for net proceeds of $989.46. On February 12, 1999, Mrs. Doxtator purchased 200 shares of Williams Coal Seam Gas for $1,850.50 which she sold on March 19, 1999, for net proceeds of $1,986.93. On March 19, 1999, Mrs. Doxtator purchased 400 shares of Burnham PAC PPTYS, Inc., for $4,188 which she sold on April 23, 1999, for $4,586.84. On April 27, 1999, Mrs. Doxtator sold 100 shares of Jevic Transportation, Inc., for net proceeds of $899.46.[4] On May 4, 1999, Mrs. Doxtator bought 200 shares of Arkansas Best Corp. Del. for $7,263 which she sold on July 6, 1999, for net proceeds of $7,249.25. On July 12, 1999, Mrs. Doxtator sold 1 share of Patriot American Hospitality, that was received pursuant to a cash merger on June 20, 1999, for net proceeds of $11.61.

---

[4] The record does not indicate the cost or acquisition date of this stock.

On February 8, 1999, a check for $5,000, payable to Mr. Doxtator, and drawn by Melinda Doxtator, his mother, cleared her account.

Petitioners reported no capital gains on their 1999 return. Respondent determined that petitioners received $15,720 in 1999 from the sale of stocks in which they had a basis of $14,720, resulting in short-term capital gain of $1,000 in 1999. Respondent further determined that petitioners had long-term capital gain of $146 in that year.

Dividend Income

Petitioners reported no dividend income on their 1999 return. Respondent determined that petitioners failed to report $281 of taxable dividends in 1999.

Oneida Tribe payments

During 1999, petitioners each received $1,500 from the Oneida Tribe and were issued Forms 1099 that reported these payments as nonemployee compensation.

The payments constituted a distribution of the profits from a casino owned and operated by the Oneida Tribe. The casino (and an associated hotel) were built on land purchased by the Oneida Tribe from "noncompetent"[5] Tribe members in 1968. The Tribe

---

[5] "A noncompetent Indian is one who holds allotted lands only under a trust patent and may not dispose of his property without the approval of the Secretary of the Interior. It does not denote mental incapacity." Stevens v. Commissioner, 452 F.2d

(continued...)

purchased the land using proceeds it received pursuant to a judgment by the Indian Claims Commission in Docket No. 75 that were distributed pursuant to the Act of September 27, 1967, Pub. L. 90-93, 81 Stat. 229, 25 U.S.C. secs. 1141-1147 (2000).

Petitioners did not report the two payments (totaling $3,000) on their 1999 return. Respondent determined that the payments were taxable per capita payments in that year.

Charitable Contributions

Petitioners claimed deductions for charitable contributions on their 1997 and 2000 returns of $5,899 and $3,969, respectively. The notice of deficiency disallowed these deductions for failure to substantiate.

Casualty Loss

Petitioners claimed a casualty loss of $4,516 on their 2000 return.

In April 2000, a water main adjacent to petitioners' residence broke and their basement was flooded with 4 to 5 feet of water. Petitioners' loss was not covered by insurance. The notice of deficiency disallowed the claimed $4,516 casualty loss.

Accuracy-Related Penalties

Petitioners previously appeared before this Court for redetermination of a deficiency with respect to their 1991

---

[5](...continued)
742 n.1 (9th Cir. 1971), affg. in part and revg. in part 52 T.C. 330 (1969).

taxable year. In that case, at docket No. 6313-95S, petitioners argued that tier II railroad retirement benefits received by Mr. Doxtator were exempt from Federal income tax because of petitioners' status as Native Americans. We concluded, in an unpublished Summary Opinion that has been made part of the record in this case, that petitioners had failed to identify any statute or treaty that would exempt the retirement benefits from tax and accordingly sustained the deficiency. Our opinion was filed on March 20, 1997.

## OPINION

### Jurisdiction

Petitioners contend that this Court does not have jurisdiction over that portion of their deficiencies that relates to "Treaty rights of the Oneida, income derived from The Sovereign Government of the Oneida, and income from an investment made by the Oneida Government, i.e. enrolled membership." Petitioners concede our jurisdiction with respect to the issues involving their claimed casualty loss and their investment income. In context, as best we can understand petitioners' claim, we believe they are challenging our jurisdiction to redetermine the deficiencies determined with respect to Mrs. Doxtator's compensation as a judicial officer for the Oneida Tribe and their receipt of the $1,500 payments from the Oneida Tribe.

We have jurisdiction to redetermine the deficiency of any taxpayer who is issued a valid notice of deficiency in respect of any tax imposed by subtitle A of the Internal Revenue Code and who timely files a petition for redetermination. Secs. 6212(a), 6213(a), and 6214(a); Monge v. Commissioner, 93 T.C. 22, 27 (1989); Normac, Inc. v. Commissioner, 90 T.C. 142, 147 (1988). The record indicates that these jurisdictional requisites have been satisfied.[6] Petitioners have not suggested or shown any defect in the notice of deficiency.

Nor have petitioners demonstrated any other basis on which this Court lacks jurisdiction, notwithstanding their claim that only Congress has the authority to consider certain of the issues in this case. Native Americans such as petitioners are U.S. citizens and generally are subject to Federal income tax in the same manner as other U.S. citizens, absent specific exemption by a treaty or statute. Squire v. Capoeman, 351 U.S. 1, 6 (1956); Estate of Poletti v. Commissioner, 99 T.C. 554, 557-558 (1992), affd. 34 F.3d 742 (9th Cir. 1994). While citing numerous treaties and statutes, petitioners have pointed to no provision that would affect our jurisdiction over the items they dispute. To the contrary, as more fully discussed hereinafter, Mrs. Doxtator's compensation for her services to the Oneida Tribe is

---

[6] Respondent issued a notice of deficiency for the taxable years 1997, 1999, and 2000 to petitioners on Oct. 31, 2002, and petitioners timely filed a petition with this Court for redetermination on Jan. 27, 2003.

subject to Federal income and self-employment tax, and the payments made to petitioners by the Oneida Tribe from the proceeds of its casino operations are subject to Federal income tax, as determined by respondent.

Having invoked our jurisdiction by filing their petition, petitioners may not unilaterally oust it. Estate of Ming v. Commissioner, 62 T.C. 519 (1974). We therefore reject petitioners' claim that we lack jurisdiction with respect to any aspect of this case.

Burden of Proof

Petitioners have neither claimed nor shown entitlement to a shift in the burden of proof to respondent with regard to any factual issue pursuant to section 7491(a). Accordingly, petitioners bear the burdens of proof and production with respect to all issues in this case, except as provided in section 7491(c). See Rule 142(a).

Judicial Officer Compensation

Respondent determined that the amounts Mrs. Doxtator received as compensation for her services as a judicial officer for the Oneida Tribe were subject to Federal income tax. Petitioners contend that those amounts are exempt from tax.

It is well established that Native Americans, or American Indians, as U.S. citizens are subject to the Federal income tax unless an exemption is created by treaty or statute. Squire v.

Capoeman, supra; Estate of Poletti v. Commissioner, supra.  For such an exemption to be valid, it must be based upon clearly expressed language in a statute or treaty.  Squire v. Capoeman, supra; United States v. Anderson, 625 F.2d 910, 913 (9th Cir. 1980); Estate of Peterson v. Commissioner, 90 T.C. 249, 250 (1988).

Petitioners argue that Mrs. Doxtator's judicial officer compensation is exempt from taxation because she was "an elected officer of a sovereign".  Petitioners persist in their argument premised on Mrs. Doxtator's status as an elected officer even though the evidence establishes, and they conceded at trial, that she was not an elected official.[7]  Regardless, her status as elected or appointed is not significant in determining whether the amounts paid to her for her services as a judicial officer are subject to income tax.  A tribal official, whether elected or appointed, is subject to income tax on the compensation received for rendering services to the tribe unless a treaty or statute specifically provides an exemption.  See Hoptowit v. Commissioner, 78 T.C. 137, 145-148 (1982), affd. 709 F.2d 564

_____

[7] Petitioners' emphasis on Mrs. Doxtator's status as an elected official appears to be an attempt to invoke Rev. Rul. 59-354, 1959-2 C.B. 24, which excludes compensation for the duties performed by elected tribal council members from the definition of "wages" for purposes of FICA, FUTA, and income tax withholding.  However, even if Rev. Rul 59-354, supra, applied to Mrs. Doxtator's compensation, it would provide no exemption from income tax.  Moreover, respondent determined that Mrs. Doxtator's compensation was income from self-employment, not wages subject to withholding.

(9th Cir. 1983); <u>Jourdain v. Commissioner</u>, 71 T.C. 980, 986-987 (1979), affd. 617 F.2d 507 (8th Cir. 1980). Petitioners have not shown that either a treaty or a statute specifically exempts Mrs. Doxtator's compensation from taxation. Accordingly, we sustain respondent's determination that Mrs. Doxtator's judicial officer compensation for the years in issue is subject to income tax.[8]

Respondent also determined that Mrs. Doxtator's judicial officer compensation is subject to self-employment tax for the years in issue.[9] As best we understand their position, petitioners offer no additional argument directed at the liability for self-employment tax beyond that offered with respect to the income tax; namely, that Mrs. Doxtator's compensation as a judicial officer is exempt because she is an elected officer of a sovereign.[10]

---

[8] Petitioners at various points claim that Mrs. Doxtator incurred travel expenses in connection with the performance of her duties as a judicial officer. However, petitioners have never identified the amounts of those expenditures, much less substantiated them under the requirements of sec. 1.274-5T(c), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985), for any year at issue.

[9] In connection with that determination, respondent allowed a corresponding deduction in each year of one-half of the self-employment taxes imposed by sec. 1401. See sec. 164(f)(1).

[10] To the extent that petitioners may again be invoking Rev. Rul. 59-354, <u>supra</u>, we note that, although the ruling does not address self-employment taxes, it does state that other salaried employees of tribal councils (besides elected council members) are not exempt from employment taxes.

Section 1401 imposes a tax on self-employment income, defined generally as "the net earnings from self-employment derived by an individual".  Sec. 1402(b).  The net earnings from self-employment are, in turn, defined generally as "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business".  Sec. 1402(a).

For purposes of self-employment income or net earnings from self-employment, the term "trade or business" has "the same meaning as when used in section 162 (relating to trade or business expenses)", with certain exceptions.  Sec. 1402(c).  Section 7701(a)(26) provides that, for purposes of the Internal Revenue Code, "the term 'trade or business' includes the performance of the functions of a public office."  However, one of the specific exceptions under section 1402(c) to the meaning of "trade or business" for self-employment tax purposes is "the performance of the functions of a public office" (with a further qualification not here pertinent).  Sec. 1402(c)(1).  Section 1402(c)(1) thus negates, for self-employment tax purposes, the inclusion under section 7701(a)(26) of the performance of public office functions within the meaning of "trade or business".  Accordingly, pursuant to section 1402(c)(1), income derived by an individual from the performance of the functions of a public

office is generally not subject to self-employment tax, because it is not derived from a "trade or business".  See Ekren v. Commissioner, T.C. Memo. 1986-509; see also Porter v. Commissioner, 88 T.C. 548, 561 (1987), revd. 856 F.2d 1205 (8th Cir. 1988), affd. sub nom. Adams v. Commissioner, 841 F.2d 62 (3d Cir. 1988).

Petitioners' claim that Mrs. Doxtator's judicial officer compensation is exempt from self-employment tax because she was an elected officer of a sovereign could be interpreted as invoking the exemption provided in section 1402(c)(1).  For the reasons discussed below, we conclude that section 1402(c)(1) provides no relief for petitioners.

The regulations under section 1402(c)(1) provide that a "public office" for this purpose "includes any elective or appointive office of the United States or any possession thereof, of the District of Columbia, of a State or its political subdivisions, or a wholly-owned instrumentality of any one or more of the foregoing."  Sec. 1.1402(c)-2(b), Income Tax Regs. The examples provided in the regulation include a judge, justice of the peace, or notary public.  Id.  Neither the statute nor the regulation defining "public office" makes any reference to Indians, Indian tribes, or Indian tribal governments.

In 1982, Congress considered the tax status of Indian tribal governments, concluded that "it is appropriate to provide these

governments with a status under the Internal Revenue Code similar to what is now provided for the governments of the States of the United States", S. Rept. 97-646, at 11 (1982), 1983-1 C.B. 514, 518, and enacted section 7871.  That section provides numerous instances where "Indian tribal governments"[11] are treated as States for various Internal Revenue Code purposes.  Section 1402(c)(1) is not one of those instances.  As Congress has considered the issue of Indian tribal and State government equivalence for Internal Revenue Code purposes and not seen fit to extend equivalence in the case of a "public office" as used in section 1402(c)(1), we conclude that it would not be appropriate to do so by judicial interpretation.[12]  Accordingly, we hold that the judicial officer position held by Mrs. Doxtator is not a "public office" within the meaning of section 1402(c)(1).  Her compensation is therefore not exempt from self-employment tax under that section.

---

[11] Sec. 7701(a)(40), adding "Indian tribal government" as a defined term in the Internal Revenue Code, was enacted at the same time.  Indian Tribal Governmental Tax Status Act of 1982, Pub. L. 97-473, sec. 203, 96 Stat. 2611.

[12] In 1988, Congress amended sec. 1402(a) as it applied to the fishing rights of members of Indian tribes.  Sec. 1402(a)(15); see Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, sec. 3043(c)(1), 102 Stat. 3642.  When amending the self-employment tax statutes in a manner specifically concerning Indian tribes, Congress again did not see fit to make Indian tribal governments equivalent to State governments for purposes of the "public office" exception from self-employment tax.

We are unable to discern in petitioners' arguments any other basis for attributing error to respondent's determination that Mrs. Doxtator's judicial officer compensation is subject to self-employment tax. Moreover, several other factors support the determination. Mrs. Doxtator controlled her own schedule. She had discretion to hear as many or as few cases as she chose. She was paid a flat stipend per case heard, regardless of its duration. She was required to provide her own transportation to the various hearing sites. Her decisions were binding on the Tribe. In sum, the manner in which she performed her duties as a judicial officer supports the conclusion that she was an independent contractor, and the Tribe treated her as such, issuing Forms 1099 with respect to the amounts paid to her for each year in issue. We accordingly sustain respondent's determination that Mrs. Doxtator's compensation as a judicial officer in 1997, 1999, and 2000 is subject to self-employment taxes.

Native American Finance

Respondent disallowed the expenses petitioners claimed on Schedules C for 1997 and 2000 on the grounds that Native American Finance was not a trade or business for purposes of section 162(a).

Section 162(a) allows deductions for ordinary and necessary expenses paid or incurred in carrying on any trade or business.

There being no statutory or regulatory definition of a trade or business, the courts have established criteria for determining the existence of a trade or business.  See, e.g., Commissioner v. Groetzinger, 480 U.S. 23, 27 (1987).  In order to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity, and the taxpayer's primary purpose for the activity must be the creation of income or profit.  Id. at 35; Nickerson v. Commissioner, 700 F.2d 402, 404 (7th Cir. 1983).  The taxpayer need not have a reasonable expectation of profit for his activities to constitute a trade or business but must conduct the enterprise with a good faith intention of making a profit or producing income.  Burger v. Commissioner, 809 F.2d 355, 358 (7th Cir. 1987), affg. T.C. Memo. 1985-523; Intl. Trading Co. v. Commissioner, 275 F.2d 578, 584 (7th Cir. 1960), affg. T.C. Memo. 1958-104; Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

Profit objective is a question of fact to be determined from all of the facts and circumstances.  Allen v. Commissioner, 72 T.C. 28, 34 (1979); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980).  More weight is given to objective facts than to the taxpayer's statement of his intent.  Burger v. Commissioner, supra at 358; Engdahl v. Commissioner, 72 T.C. 659, 666 (1979).  In determining whether a

taxpayer had the requisite profit motive under section 162(a), the factors set forth in the regulations promulgated under section 183 are considered.  Sullivan v. Commissioner, T.C. Memo. 1998-367, affd. 202 F.3d 264 (5th Cir. 1999).  In addition to the taxpayer's continuity and regularity in pursuing the activity, as cited by the Supreme Court in Commissioner v. Groetzinger, supra, factors listed in the section 183 regulations include whether the activity is conducted in a businesslike manner, sec. 1.183-2(b)(1), Income Tax Regs., and the taxpayer's history of income or losses with respect to the activity, sec. 1.183-2(b)(6), Income Tax Regs.

Mr. Doxtator did not conduct the Native American Finance activity with continuity and regularity.  Although petitioners' 1998 return is not in the record, their 1999 return is, and it contains no Schedule C reporting operations of Native American Finance in 1999.  Thus, the activity was not continuous between 1997 and 2000.

Mr. Doxtator also did not conduct the activity in a businesslike fashion.  When tribal officials failed to pay his finder's fee, he took no steps to ensure that he would be paid for future transactions, such as switching to written contracts instead of oral agreements.  Mr. Doxtator also commingled the expenses of Native American Finance with those of Mrs. Doxtator's judicial officer work.  Finally, petitioners reported no gross

receipts, much less profits, from the enterprise during the years at issue; Mr. Doxtator conceded that the reported gross receipts were actually payments for travel expenses.

Considering all of the foregoing factors, we conclude that petitioners have failed to show error in respondent's determination that the Native American Finance activity was not a trade or business within the meaning of section 162(a). Accordingly, we sustain respondent's determination to disallow the cost of goods sold in 1997. We also sustain respondent's determination to disallow the claimed expense deductions in 1997 and 2000 and to reclassify the gross receipts reported on the respective Schedules C as income from activities not engaged in for profit.[13]

Capital Gains

Respondent determined that petitioners received $15,720 in 1999 from the sale of stocks in which they had a basis of $14,720, resulting in short-term capital gain of $1,000 in 1999. Respondent further determined that petitioners had long-term capital gain of $146 in that year.

Petitioners concede that stocks held in Mrs. Doxtator's name that were sold in 1999 generated the $15,720 in proceeds noted above. They also have not challenged, in their testimony or on

---

[13] This is the effective result of moving the gross receipts from Schedule C to line 21, "Other Income", on the Form 1040 as respondent did in the notice of deficiency.

brief, respondent's computations of the amount of gain.[14] Instead, they argue that the stocks were purchased with funds of Mr. Doxtator's mother, Melinda Doxtator, on her behalf. Therefore, petitioners contend, the gain on the sale of the stocks is not taxable to them.

While the evidence establishes that Melinda Doxtator transferred $5,000 to Mr. Doxtator in 1999, in the form of her check made payable to him that cleared her account on February 8, 1999, we nonetheless conclude on the basis of the entire record that petitioners have not shown that the stocks generating the gains at issue were the property of Melinda Doxtator rather than Mrs. Doxtator.

Petitioners' claims that these gains were Melinda Doxtator's rather than petitioners' are inconsistent and confused. First, Mr. Doxtator testified at trial that the stocks generating the gains at issue were purchased with $2,000 of petitioners' money

_____

[14] The stipulated exhibits contain a worksheet that petitioners prepared covering their 1999 stock transactions. This worksheet indicates that petitioners' gain on the sale of the stocks at issue was $919 (versus respondent's determination of $1,000 in short-term, and $146 in long-term, capital gain). However, the worksheet indicates that the gain on the sale of Mrs. Doxtator's Jevic Transportation, Inc. stock was $87.50, without disclosing Mrs. Doxtator's basis in, or holding period for, that stock. There is no evidence of the basis or holding period anywhere else in the record. Accordingly, we are not persuaded that petitioners' worksheet demonstrates any error in respondent's determination. Moreover, nowhere in their testimony or brief do petitioners contend that the worksheet proves error in respondent's determination. Their only argument (considered above) is that the stocks, and therefore the gains from the stocks, belonged to Mr. Doxtator's mother.

and $5,000 of Melinda Doxtator's money.  For reasons that are not clear, Mr. Doxtator contended that this arrangement resulted in petitioners' having a 40-percent share of any gain, but then persisted in claiming that "any gain went to her [Melinda Doxtator]".  On brief, petitioners contended for a different version of the arrangement; namely, that the money for the investment in the stocks was 28 percent from petitioners' funds, 14 percent from a friend (Pearl McLester, mentioned for the first time on brief), and 71 percent from Melinda Doxtator.[15]  As was true of the first version, petitioners offer no explanation concerning why, if they contributed a share of the invested funds, no portion of the gain was theirs.  Although Mr. Doxtator testified that all gains in 1999 were paid over to Melinda Doxtator, he offered no evidence to corroborate this contention. We are not required to accept Mr. Doxtator's uncorroborated, self-serving testimony, and we do not.  See Niedringhaus v. Commissioner, 99 T.C. 202, 212 (1992); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  Second, petitioners' varying positions regarding the source of the investment funds may reflect the fact that their claim that Melinda Doxtator's $5,000 contribution entitled her to "most" or "all" of the resulting gain cannot be

---

[15] Aside from the facial contradiction in this later version of the allocation (the portions of which total 113 percent), unsupported statements in a brief do not constitute competent evidence.  Rule 143(b); Niedringhaus v. Commissioner, 99 T.C. 202, 214 n.7 (1992); Viehweg v. Commissioner, 90 T.C. 1248, 1255 (1988); Castro v. Commissioner, T.C. Memo. 2001-115.

squared with their own worksheet covering the stock transactions, which indicates that the aggregate acquisition price of the stocks at issue was $14,867[16] (a figure not at substantial variance from respondent's determination that their basis was $14,720). Finally, at least one[17] of the stocks at issue was acquired on January 25, 1999, before Melinda Doxtator transferred $5,000 to Mr. Doxtator. That stock (American Pad & Paper Co.), according to petitioners' own worksheet, accounted for $375 in gain, or over one-third of the short-term capital gain determined by respondent for 1999. In sum, petitioners' confused and inconsistent claims regarding Melinda Doxtator's ownership of the stocks giving rise to the capital gains determined by respondent fail to persuade us that petitioners have demonstrated any error in that determination. Accordingly, we sustain respondent's determination that petitioners had $1,000 in short-term capital gain and $146 in long-term capital gain in 1999.

_____

[16] The figure represents the acquisition prices (plus commissions) listed by petitioner for the stocks at issue, which is generally corroborated by the confirmation statements in the record. In the case of the Jevic Transportation, Inc. stock, petitioners' worksheet does not list an acquisition price, but it can be derived by comparing the gain they list for the sale of that stock with the (undisputed) proceeds of sale listed on the Form 1099 issued to Mrs. Doxtator.

[17] Petitioners have not alleged the date that the Jevic Transportation, Inc. stock was acquired, except to the extent that an inference may be drawn from their failure to list it on their worksheet among the stocks acquired in 1999. If this stock had been acquired before 1999, it would represent an additional stock acquired before Melinda Doxtator transferred any funds to Mr. Doxtator.

Taxable Dividends

Dividends are taxable income. Sec. 61(a)(7). Respondent determined that petitioners failed to report $281 in dividend income received during 1999. Petitioners conceded receipt of $281 in dividends but maintain that this amount is not taxable income to them because the dividends were received with respect to stocks that belonged to Melinda Doxtator and were paid over to her. For the reasons discussed in connection with our consideration of petitioners' capital gains in 1999, we conclude that petitioners have failed to show that any of the stocks titled in Mrs. Doxtator's name were being held on behalf of Melinda Doxtator or that any proceeds related to those stocks were paid over to Melinda Doxtator. Accordingly, we sustain respondent's determination.

Oneida Tribe Payments

Respondent determined that petitioners failed to report $3,000 in taxable per capita payments in 1999. Petitioners contend that the payments are exempt from tax.

The payments at issue were received by petitioners from the Oneida Tribe and constituted a distribution of the profits from a casino operated by the Tribe. The payments were reported on Forms 1099 by the Tribe as taxable nonemployee compensation.

Petitioners first argue that the payments are not per capita payments because they were not distributed equally to members of

the Oneida Tribe and therefore are not per capita payments under the Indian Gaming Regulatory Act (IGRA), Pub. L. 100-497, 102 Stat. 2467 (1988), 25 U.S.C. secs. 2701-2721 (2000).

The record in this case is insufficient for us to draw a conclusion regarding whether these payments would constitute per capita payments as that term is used in the IGRA.  Mr. Doxtator testified at trial that all Tribe members under age 59-1/2 received identical $1,500 payments, while older Tribe members received larger payments.  There is no evidence corroborating Mr. Doxtator's testimony that payments to Tribe members varied according to age.  Under the IGRA, revenues from Indian gaming activities may be used to make per capita payments to tribe members only under arrangements that have been approved by the Secretary of the Interior.  See 25 U.S.C. sec. 2710(b)(3), (d)(1)(A)(ii); 25 C.F.R. secs. 290.2, 290.5 (2004).  On this record, we are unable to determine whether the payments were distributed without the Secretary's approval, in contravention of the IGRA, or whether the Secretary approved per capita payments that varied by age.  In these circumstances, we conclude that petitioners have failed to meet their burden of showing error in respondent's determination that the payments were per capita payments.

In any event, these payments would be subject to Federal income tax regardless of their status as per capita payments.

Whether the casino was located on tribal land (as respondent contends) or on allotted land[18] (as petitioners at times appear to contend), the payments, constituting distributions to Tribe members of profits from a casino owned and operated by the Tribe, would be taxable to the Tribe members receiving them.  If on tribal land, they would be taxable on receipt.  Choteau v. Burnet, 283 U.S. 691 (1931); Anderson v. United States, 845 F.3d 206 (9th Cir. 1988); Fry v. United States, 557 F.2d 646 (9th Cir. 1977); Holt v. Commissioner, 364 F.2d 38 (8th Cir. 1966), affg. 44 T.C. 686 (1965).  If on allotted land, they would be taxable upon receipt because not "derived directly" from the allotted land.  See Squire v. Capoeman, 351 U.S. 1 (1956); Cross v. Commissioner, 83 T.C. 561 (1984), affd. sub nom. Dillon v. United States, 792 F.2d 849 (9th Cir. 1986); Hoptowit v. Commissioner, 78 T.C. 137 (1982); Critzer v. United States, 220 Ct. Cl. 43, 597 F.2d 708 (1979).

---

[18] Under the General Allotment Act of 1887, ch. 119, 24 Stat. 388, as amended, Indians were allotted shares of reservation land, held in trust on their behalf by the United States.  See Squire v. Capoeman, 351 U.S. 1, 3 (1956).  Indians holding such allotments could not alienate or encumber the property without consent of the U.S. Government.  Id. at 4. Indians possessing such allotments were referred to as "noncompetent" because of their inability to alienate or encumber the land they held.  Hoptowit v. Commissioner, 709 F.2d 564, 565 n.1 (9th Cir. 1983), affg. 78 T.C. 137 (1982).
In this case, the parties agree that the Oneida Tribe purchased the land on which the casino was located from noncompetent Tribe members in 1968.  In respondent's view, the land became tribal land upon this purchase, whereas petitioners, though not clear on this point, appear to take the position that the land retained its character as allotted land.

Petitioners also appear to argue that the payments at issue are subject to a specific exemption from Federal income tax because they are traceable to, or somehow derived from, funds constituting the payment to the Oneida Tribe of a judgment against the United States. On brief, as a basis for exemption, petitioners refer to "Docket No. 75 (Indian Claims Commission {1967})" and an exhibit in the record further clarifies that "Docket No. 75" is often used in reference to litigation known as the New York Emigrant Claim made on behalf of certain tribes that left New York for Wisconsin, including the Oneida Tribe of Wisconsin. Provision for payment of a judgment to the Oneida Tribe (and two other tribes) was made pursuant to the Act of September 27, 1967, codified as subchapter LVI of title 25 of the U.S. Code (25 U.S.C. secs. 1141-1147). Since 25 U.S.C. sec. 1146 provides an exemption from Federal income taxes with respect to certain payments made pursuant to 25 U.S.C. subchapter LVI, we treat petitioners as having invoked the exemption of 25 U.S.C. sec. 1146.

Petitioners contend, and stipulated exhibits in the record corroborate their contention, that the land on which the casino was located was purchased by the Oneida Tribe in 1968 with $60,000 in funds from the judgment received by the Tribe pursuant to 25 U.S.C. subchapter LVI. That subchapter, at 25 U.S.C. sec. 1145, provides: "The funds apportioned to the Oneida Tribe of

Indians of Wisconsin * * * shall be placed to their credit and may be * * * expended * * * for any purposes that are authorized by the tribal governing bod[y] thereof and approved by the Secretary of the Interior."  Section 1146 of title 25 then provides an exemption from Federal income taxes for the foregoing funds, as follows:  "None of the funds <u>that may be distributed per capita</u> shall be subject to Federal or State income taxes." (Emphasis added.)

To the extent petitioners may be claiming that the exemption from Federal income taxes provided in 25 U.S.C. sec. 1146[19] covers the payments at issue in this case, we disagree.  Section 1146 of title 25 by its terms covers only per capita distributions of the judgment funds.  The Oneida Tribe's expenditure of $60,000 of the judgment funds to purchase the casino land was <u>not</u> a per capita distribution; that is, it was not a distribution made to all members of the Oneida Tribe. Rather, it was a purchase of land from the Tribe members to whom the land had been allotted.  The exemption provided in 25 U.S.C.

---

[19] On brief, petitioners also cite 25 U.S.C. sec. 1401, which we take to be a reference to the Indian Tribal Judgment Funds Use or Distribution Act, Pub. L. 93-134, 87 Stat. 466 (1973), codified at 25 U.S.C. secs. 1401-1408 (2000).  The act provides rules of general applicability to the payment of Indian tribal judgments, including a provision granting exemption from Federal and State income taxes for such payments (25 U.S.C. sec. 1407).  However, these provisions, enacted in 1973, would not apply to the distributions of the judgment funds at issue herein, which occurred in 1968.

sec. 1146 is therefore inapplicable to the distribution of casino profits over 30 years later.

Our conclusion finds further support in the IGRA.  In that act, Congress specifically addressed the question of Federal income taxation of the distribution of revenues from Indian gaming activities to tribe members.  Section 2710(b)(3) of title 25 provides:

> (3) Net revenues from any class II [or III[20]] gaming activities conducted or licensed by any Indian tribe may be used to make per capita payments to members of the Indian tribe only if --
>
> \*       \*       \*       \*       \*       \*       \*
>
> (D) the per capita payments are subject to Federal taxation and tribes notify members of such tax liability when payments are made.

Thus, it was Congress's understanding in permitting distributions to tribe members of revenues from gaming activities conducted by the tribe that such distributions would be subject to Federal taxation.  Petitioners' contention that the exemption provided in 25 U.S.C. sec. 1146 reaches payments to Oneida Tribe members of tribal gaming revenues cannot be reconciled with the congressional intent to tax gaming revenues evidenced in 25

---

[20] The IGRA classifies gaming into three categories: class I, generally covering social games for prizes of minimal value; class II, which consists of bingo and certain card games; and class III, which covers all remaining gaming, such as that typically conducted in casinos.
Sec. 2710(d)(1)(A) of tit. 25 makes the provisions of 25 U.S.C. sec. 2710(b) applicable to class III gaming.

U.S.C. sec. 2710(b)(3)(D).  We accordingly sustain respondent's determination that petitioners failed to report $3,000 in taxable income arising from the payments in that amount made to them by the Oneida Tribe in 1999.

Charitable Contributions

Section 170(a) generally allows a deduction for contributions made to certain designated entities, provided such contributions are verified under regulations prescribed by the Secretary.  Depending upon the size of the contribution, the verification requirement is satisfied by reliable written records or by a written acknowledgment from the recipient entity.  See sec. 170(f)(8); sec. 1.170A-13(a)(1), Income Tax Regs.

Respondent disallowed petitioners' claimed charitable contribution deductions of $5,899 and $3,969 for 1997 and 2000, respectively, for failure to substantiate the deductions. Petitioners claim to have submitted substantiation of their 1997 and 2000 charitable contribution deductions to respondent's field office in Green Bay, Wisconsin.  However, they have not produced any evidence in support of this claim or provided any written evidence to verify or substantiate the claimed deductions.[21]

In the absence of evidence to verify or substantiate petitioners' claimed charitable contribution deductions, we

---

[21] On the basis of his testimony, Mr. Doxtator appears to believe that a taxpayer is entitled to a charitable contribution deduction equal to 10 percent of his income, without regard to verification or substantiation.

sustain respondent's determination disallowing those deductions for the 1997 and 2000 taxable years.

Casualty Loss

Respondent disallowed petitioners' claimed casualty loss of $4,516 for 2000. Under section 165(c)(3), a taxpayer may deduct property losses not compensated by insurance or otherwise, arising from fire, storm, shipwreck, or other casualty or from theft. To qualify as a casualty, the event causing the loss must be sudden and not the result of deterioration over time. Maher v. Commissioner, 680 F.2d 91, 92 (11th Cir. 1982), affg. 76 T.C. 593 (1981); Coleman v. Commissioner, 76 T.C. 580, 589 (1981).

Respondent conceded on brief that petitioners incurred a casualty loss from flooding in April 2000. Respondent further conceded $1,090 of casualty losses substantiated by petitioners after the petition was filed.[22] The remaining $3,426 in claimed casualty losses is still in dispute, and respondent maintains that these losses should be disallowed because petitioners have failed to substantiate them.

Petitioners describe the unsubstantiated amounts as covering a "box of valuables", two chainsaws, two dehumidifiers, and approximately $3,000 in clothing and bedding damaged in the flood. Petitioners have offered no evidence to corroborate these additional losses claimed. Accordingly, we hold that petitioners

---

[22] This amount covers substantiated costs of replacing a water heater, furnace, and sump pump.

have failed to substantiate casualty losses greater than the amounts conceded by respondent, and we sustain that portion of respondent's determination that has not been conceded.

Accuracy-Related Penalties

Respondent determined that petitioners were liable for the accuracy-related penalty based on a substantial understatement of income tax, or alternatively, negligence or disregard of rules or regulations, for 1997 and 1999. Sec. 6662(a) and (b)(1) and (2). Respondent also determined that petitioners were liable for the accuracy-related penalty based on negligence or disregard of rules or regulations for 2000. Sec. 6662(a) and (b)(1).

A "substantial understatement" exists for this purpose if the amount of tax required to be shown on the return exceeds that shown by the greater of 10 percent of the tax required to be shown or $5,000. Sec. 6662(d). "Negligence" for purposes of section 6662 includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs.

Only one accuracy-related penalty may be imposed with respect to any given portion of an underpayment, even if that portion is attributable to more than one of the types of misconduct listed in section 6662(b). Jaroff v. Commissioner, T.C. Memo. 2004-276; sec. 1.6662-2(c), Income Tax Regs.

The Commissioner has the burden of production under section 7491(c) with respect to the liability of any individual for a penalty imposed by the Internal Revenue Code and must come forward with sufficient evidence indicating that it is appropriate to impose the penalty. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). Because we have sustained, or petitioners have conceded, every element of the deficiencies determined for 1997 and 1999, each of which exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000, respondent has met his burden of production with respect to the penalties for substantial understatement in 1997 and 1999. Once the Commissioner meets the burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination as to the penalties is incorrect or that the taxpayer had reasonable cause or substantial authority for his position. Id. at 447; sec. 1.6664-4, Income Tax Regs.

A penalty under section 6662(a) will not be imposed with respect to any portion of the underpayment as to which the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, supra at 448. The decision as to whether a taxpayer acted with reasonable cause and in good faith is made by taking into account all the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Relevant factors include the taxpayer's efforts to assess his or her

proper tax liability, including the taxpayer's reasonable and good faith reliance on the advice of a tax professional. See id.; see also sec. 1.6664-4(c), Income Tax Regs. Further, an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer may indicate reasonable cause and good faith. See Remy v. Commissioner, T.C. Memo. 1997-72.

Petitioners assert that they had reasonable cause for the various positions taken on all their returns. In considering this issue, we note that Mr. Doxtator was a well-informed taxpayer. He was a volunteer tax return preparer for the IRS between 1996 and 1998. In these proceedings, he has cited taxation and Indian law authorities extensively. Moreover, in their previous case before this Court, petitioners claimed an exemption from tax, based on their status as Native Americans, for tier II railroad retirement benefits, but they failed to identify any treaty or statute providing such an exemption. Our opinion to that effect was issued before any of the return positions at issue herein were taken. In this context, we address petitioners' return positions.

We find no reasonable cause for petitioners' position that Mrs. Doxtator's judicial officer compensation is not subject to income tax in 1997 and 1999. Petitioners disregarded information

returns pertaining to this income and claimed without any basis that Mrs. Doxtator was an elected official.

Our conclusion is different regarding petitioners' position that Mrs. Doxtator's judicial officer compensation in 1997 and 1999 was exempt from self-employment tax. We conclude that a taxpayer in petitioners' circumstances could have believed in good faith that Mrs. Doxtator's duties as a judicial officer for the Oneida Tribe were sufficiently similar to "the performance of the functions of a public office" that she was entitled to the exemption from self-employment tax provided in section 1402(c)(1). We note that this exemption does not depend upon the public office's elective or appointive status. We therefore conclude that petitioners had reasonable cause with respect to that portion of the underpayment in 1997 and 1999 attributable to their failure to treat Mrs. Doxtator's judicial officer compensation as subject to self-employment tax.

We do not find reasonable cause for any other positions taken on the 1997 and 1999 returns. Regarding Native American Finance, petitioners provided no substantiation for the deductions claimed in 1997 nor any persuasive reason for their failure to do so, and Mr. Doxtator conceded that the amounts claimed included expenses incurred by Mrs. Doxtator in the performance of her judicial officer duties. Petitioners' claims that the 1999 capital gains and dividend income were actually

attributable to Mr. Doxtator's mother were inconsistent and largely uncorroborated. With respect to the Oneida Tribe payments in 1999, petitioners disregarded Forms 1099 indicating that these amounts were taxable. Moreover, petitioners' brief demonstrates extensive study of statutes, treaties, and caselaw affecting Native Americans, including the IGRA, yet they disregarded the specific IGRA provision (25 U.S.C. sec. 2710(b)(3)(D), discussed supra pp. 29-30) that addresses the taxability of distributions of Indian gaming revenues. Regarding claimed charitable contribution deductions in 1999, petitioners did not offer any persuasive reason for their failure to substantiate the substantial amounts claimed. Finally, petitioners conceded without further explanation their failure to report interest income in 1999.

Since we conclude that petitioners had substantial understatements for 1997 and 1999, we address respondent's determination of negligence for 2000 only. We are satisfied that respondent has met his burden of production, and that the evidence supports a finding of negligence or disregard of rules or regulations within the meaning of section 6662(b)(1), for all portions of the underpayment in 2000 except that attributable to petitioners' liability for self-employment tax on Mrs. Doxtator's judicial officer compensation in that year. For essentially the same reasons that we found reasonable cause for petitioners'

position regarding self-employment taxes in 1997 and 1999, we conclude that they were not negligent regarding this item in 2000. Their position regarding income tax liability for this amount, by contrast, lacks any basis. Likewise, petitioners' failure to substantiate the claimed expenses in 2000 for Native American Finance, and their commingling of unrelated expenses in that claim, disregards their record-keeping obligations. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs. The foregoing regulations were also disregarded when petitioners claimed casualty losses that were more than $3,000 greater than what they could substantiate. Their failure to substantiate nearly $4,000 in claimed charitable contribution deductions for 2000 disregards the specific requirements of section 170(f)(8) and/or section 1.170A-13(a)(1), Income Tax Regs. Their failure to report taxable interest income in 2000 is unexplained. We accordingly conclude that petitioners' underpayment for 2000, with the exception of the portion noted above, is attributable to negligence or disregard of rules or regulations.

To reflect the foregoing,

Decision will be entered

under Rule 155.